UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

WILLIAM HOWER MELENDEZ,

      Plaintiff,

v.                                  Case No. 3:15cv450-RV-CJK

FLORIDA DEPARTMENT OF
CORRECTIONS, et al.,

      Defendants.
_____/

ORDER and
REPORT AND RECOMMENDATION

This matter is before the court on plaintiff's civil rights complaint (doc. 1)[1] and motion to proceed *in forma pauperis* (doc. 2). At the court's direction, the Secretary of the Florida Department of Corrections ("FDOC") filed a response to plaintiff's motion to proceed *in forma pauperis*. (Docs. 14, 16, 29). Plaintiff subsequently filed a reply to the FDOC's response. (Docs. 15, 33). Plaintiff also filed a "Motion Seeking Temporary Injunction." (Docs. 17, 21). The FDOC responded in opposition (doc. 22) and plaintiff filed a "Motion to Reply" (doc. 24) along with the proposed reply (doc. 25).

---

[1] The references to document and page numbers will be to those automatically generated by the CM/ECF system.

The matter has been referred to the undersigned Magistrate Judge for Report and Recommendation pursuant to 28 U.S.C. § 636 and N.D. Fla. Loc. R. 72.2(C). Upon careful consideration of the parties' submissions and the relevant law, the undersigned recommends that plaintiff's motion to proceed *in forma pauperis* be denied because plaintiff is not under imminent danger of serious physical injury that could be redressed in this suit.  This action, therefore, should be dismissed without prejudice.

## BACKGROUND AND PROCEDURAL HISTORY

Plaintiff is a prisoner of the Florida Department of Corrections ("FDOC") currently confined at Santa Rosa Correctional Institution Annex.[2]  He commenced this action on October 12, 2015, by filing a civil rights complaint pursuant to 42 U.S.C. § 1983 (doc. 1) and motion to proceed *in forma pauperis* (doc. 2).  The complaint names the FDOC, Corizon Health, Inc., and twenty-seven individuals associated with the FDOC as defendants.  (Doc. 1, p. 2-4).  Plaintiff alleges the defendants violated: (1) the First Amendment by retaliating against him for filing grievances; and (2) the Eighth Amendment by failing to provide him with adequate medical care.  (*Id.*, p. 13).  For relief, plaintiff seeks compensatory damages and an injunction requiring Dr. Gaurang Shah to evaluate and treat him.  (*Id.*, p. 12-13).

---

[2] *See* Florida Department of Corrections, Corrections Offender Network, Inmate Population Information Search, http://www.dc.state.fl.us/ActiveInmates/ (last visited August 30, 2016).

Plaintiff is subject to the "three strikes" provision of 28 U.S.C. § 1915.[3]  Under

28 U.S.C. § 1915, a prisoner may not proceed *in forma pauperis*:

> if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

28 U.S.C. § 1915(g).  Because plaintiff has had three actions dismissed for failure to

state a claim, he may not proceed *in forma pauperis* in the present action unless he

is "under imminent danger of serious physical injury."

The complaint alleges plaintiff is under imminent danger of serious physical

injury due to the FDOC's failure to provide plaintiff with adequate medical care for

hepatitis C, gastrointestinal issues, high cholesterol, and high blood sugar.  (Doc. 1,

p. 8-12).  Because allegations concerning a lack of medical treatment can meet §

1915's "imminent danger" exception, the court directed the FDOC to respond to

plaintiff's allegations.  (Docs. 12, 14, 16).  Plaintiff filed a reply to the FDOC's

response (doc. 15) and a "Motion Seeking Temporary Injunction."  (Doc. 17, 21).

---

[3] While confined at Pasco County Jail, plaintiff filed three actions in the Middle District of Florida, all of which were dismissed for failure to state a claim.  (Doc. 1, p. 7); *see Melendez v. Sayer*, Case No. 8:10cv467-JSM/AEP (M.D. Fla. Mar. 23, 2010); *Melendez v. Moe*, Case No. 8:10cv468-JDW/TBM (M.D. Fla. Mar. 30, 2010); *Melendez v. Alfaro*, Case No. 8:10cv466-JDW/EAJ (M.D. Fla. June 11, 2010).  Plaintiff's status as a three-striker has also been recognized in the Northern District of Florida.  *See Melendez v. Brantly*, Case No. 4:14cv147-RH/GRJ (N.D. Fla. Apr. 29, 2014).

The FDOC responded in opposition to the motion for injunctive relief (doc. 22) and plaintiff then filed a reply.  (Doc. 25).  To be absolutely certain of the status of plaintiff's conditions, and to assure this court's understanding of those conditons, on April 28, 2016, the undersigned ordered the FDOC to file an updated copy of plaintiff's medical records.  (Doc. 28).  After the FDOC filed the records (doc. 29), plaintiff filed a response which also included relevant medical evidence.  (Doc. 33).

## DISCUSSION

Plaintiff alleges he is in imminent danger of serious physical injury due to the FDOC's ongoing failure to provide care for his hepatitis C, gastrointestinal issues, high cholesterol, and high blood sugar.  This report and recommendation will look at each of these health issues, and then at the Eighth Amendment standard for deliberate indifference.

Hepatitis C

Plaintiff entered the Florida penal system already diagnosed with hepatitis C[4] in October 2011.  (Doc. 14-2, p. 4, 6-7).  Inmates "with Hepatitis C are enrolled in the prison's Chronic Illness Clinic, where they are evaluated by clinicians and have labs done regularly."  (Doc. 16-1, p. 2).  Dr. Gaurang Shah ordered an ultrasound of plaintiff's liver on April 9, 2012; the radiologist noted "negative ultrasound

---

[4] "Hepatitis C is an infectious disease that primarily affects the liver.  Although Hepatitis C often has no symptoms, chronic infection can lead to liver damage, cirrhosis, liver cancer, and liver failure."  *Black v. Ala. Dep't of Corr.*, 578 F. App'x 794, 795 (11th Cir. 2014).

examination of the liver." (Doc. 14-2, p. 124). On May 29, 2013, Dr. Shah performed a liver biopsy. (*Id.*, p. 99). The biopsy revealed: "Liver with chronic hepatitis, HAI grade 9 (3+0+3+3) by modified Knodell scording; Mild sinusoidal dilation; Periportal fibrosis with early bridging is seen on trichrome stain (stage 3 out of 6); No significant iron deposition is seen on Prussian blue stain; No diagnostic intracytoplasmic inclusions are seen on PAS and PAS-D stains." (*Id.*).

Following the liver biopsy, Dr. Shah ordered treatment for the hepatitis C: a weekly shot of Pegasys (peginterferon alfa-2a) for 48 weeks; three ribavirin pills twice a day for 48 weeks; and two doses of Incivek three times a day for 12 weeks. (Doc. 15-1, p. 32; doc. 1, p. 8). Treatment commenced in August 2013 (doc. 1, p. 8; doc. 15-1, p. 34) but plaintiff did not receive the Incivek. (Doc. 1, p. 8). The FDOC's Regional Medical Director denied a drug exception request ("DER") for Incivek on October 18, 2013:

> We have addressed this issue multiple times that we are not ready to proceed with Triple therapy with Incivik. I have asked people to hold off on these DER's until we can organize our program. We will only [be] using triple therapy at designated centers of excellence.

(Doc. 15-1, p. 33).

In addition, plaintiff asserts medical staff at Union Correctional Institution and Santa Rosa Correctional Institution ("SRCI") failed to administer the Pegasys shots in a timely manner. (Doc. 1, p. 9-11). Medical personnel at SRCI discontinued the Pegasys and ribavirin regimen in June 2014 after tests showed plaintiff's viral

load had increased, indicating the treatment was no longer working.  (Doc. 16-1, p. 2; doc. 14-2, p. 34).  Plaintiff claims the treatment was unsuccessful due to staff's failure to administer the medication according to Dr. Shah's and the drug manufacturer's instructions.  (Doc. 1, p. 9-11; doc. 11, p. 2; doc. 15, p. 2).  Nurse Nichols advised plaintiff that new drugs were in testing and treatment could be successful in the future.  (Doc. 14-2, p. 34).  Dr. Albert Maier, Senior Physician for the FDOC, has declared "Pegasys treatment is no longer the standard of care for Hepatitis C since other drugs have come on the market."  (Doc. 16-1, p. 2).

On February 1, 2015, plaintiff filed a grievance appeal to the Secretary of the FDOC.  (Doc. 15-1, p. 89).  In the appeal, plaintiff complained about the administration and discontinuation of the Pegasys treatment.  (*Id.*).  He also mentioned that S. Schwartz, Medical Director of SRCI, claimed plaintiff didn't "qualify for the treatment of 'Sovaldi.'"  (*Id.*).  In response to the appeal, Ebony Harvey advised plaintiff his "appeal is being approved to the extent that you are being placed on the waiting list for these medications and you will be advised when it is your turn."  (Doc. 15-1, p. 88).  In a September 21, 2015 grievance response, however, Harvey informed plaintiff "that your treatment is being deferred at this time until it becomes clinically indicated."  (*Id.*, p. 90).  "Since the discontinuation of the [Pegasys] treatment in 2014, Melendez has continued to be closely monitored with regular labs and visits to the Chronic Illness Clinic."  (Doc. 16-1, p. 2).

The FDOC "follows the Federal Bureau of Prisons' policies on Hepatitis C treatment, which prioritizes treatment based on the advancement of cirrhosis[5] and the presence of certain infections or certain conditions associated with Hepatitis C, such as certain cancers."  (Doc. 22-1, p. 1).  The BOP's 2015 Clinical Practice Guidelines for the Evaluation and Management of Chronic Hepatitis C Virus Infection indicate that "the APRI [AST-to-Platelet Ratio Index] score is the BOP-preferred method for non-invasive assessment of hepatic fibrosis and cirrhosis."  (Doc. 22-2, p. 9).  "The APRI score, a calculation based on results from two blood tests (the AST [aspartate aminotransferase] and the platelet count), is a less invasive and less expensive means of assessing fibrosis than a liver biopsy."  (*Id.*, p. 7).  A liver biopsy is no longer required unless otherwise clinically indicated.  (*Id.*, p. 9).

The BOP's guidelines provide that an APRI score greater than or equal to 2.0 may be used to predict the presence of cirrhosis.  (*Id.*, p. 9).  An APRI score of 1.5 or greater may be used to predict the presence of significant fibrosis.  (*Id.*). According to the declaration of Dr. Maier, lab results from July and August 2015 show plaintiff had an APRI score of 0.7, which does not require treatment or indicate he is at risk for any associated conditions in the future.  (Doc. 22-1, p. 2); *see also* (Doc. 16-1, p. 2) ("Nothing in Melendez's record indicates he has significant fibrosis

---

[5] "Cirrhosis is a condition of chronic liver disease marked by inflammation, degeneration of hepatocytes, and replacement with fibrotic scar tissue."  (Doc. 22-2, p. 8).

requiring treatment, or that he has any co-infections associated with Hepatitis C."); (*id.*) ("Currently, [Melendez] is not a candidate for additional treatment, as he has a history of failed treatment and his testing does not show a progression of the disease such that treatment is necessary."). Lab results from November 2015 again indicated plaintiff has an APRI score of 0.7.[6]  (Doc. 29-1, p. 29).  Although May 2016 lab results indicate plaintiff's APRI score is 1.2 (doc. 33-1, p. 13-14), the score does not indicate plaintiff has significant fibrosis or that he is an "Intermediate Priority for Treatment" under the BOP's guidelines.  (Doc. 22-2, p. 9, 12).  As the guidelines indicate, "progression of chronic HCV infection to fibrosis and cirrhosis may take years in some patients and decades in others—or, in some cases, may not occur at all.  Most complications from HCV infection occur in people with cirrhosis."  (Doc. 22-2, p. 8).

Plaintiff claims he is in imminent danger of serious physical injury because the FDOC has failed to provide adequate treatment for his hepatitis C.  Plaintiff's beliefs concerning the severity of his condition, however, are based on an erroneous reading of his medical record.   For example, plaintiff claims he has both hepatocellular carcinoma and decompensated cirrhosis.  (Doc. 17).   None of

---

[6] This APRI score was obtained by inserting the AST and platelet count results from plaintiff's November 30, 2015 blood test (doc. 29-1, p. 29) into the APRI calculator referenced in the BOP's Guidelines.   (Doc. 22-2, p. 8); http://www.hepatitisc.uw.edu/page/clinical-calculators/apri. Likewise, the May 2016 APRI score was calculated using the same method.

plaintiff's medical records indicate he suffers from either of these conditions.  In the records describing the results of plaintiff's liver biopsy in May 2013, the following notation appears: "R/O hepatocellular carcinoma."  Plaintiff views this notation as confirmation that he suffers from hepatocellular carcinoma, the most common form of liver cancer.  "R/O," however, is an abbreviation for "rule out," a term used in differential diagnosis.  *See Guinn v. AstraZeneca Pharm., LP*, 602 F.3d 1245, 1253 (11th Cir. 2010) ("Differential diagnosis 'is accomplished by determining the possible causes for the patient's symptoms and then eliminating each of these potential causes until reaching one that cannot be ruled out or determining which of those that cannot be excluded is the most likely.'") (*quoting Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 262 (4th Cir. 1999)).

Similarly, plaintiff calculates he has decompensated cirrhosis by inserting his "HAI grade by modified Knodell scoring"[7] number into a chart designed for interpreting a Child-Turcotte-Pugh (CTP) score, which "is a useful tool in determining the severity of cirrhosis and in distinguishing between compensated and decompensated liver disease."  (Doc. 22-2, p. 8-10).  The CTP score, however, "includes five parameters (albumin, bilirubin, [International Normalization Ratio], ascites, and hepatic encephalopathy), each of which is given a score of 1, 2, or 3.

---

[7] "HAI stands for Hepatic Activity Index, which takes into account different categories of necroinflammatory activity and degree of fibrosis and adds them together to obtain the HAI, ranging from 0-22."  (Doc. 22-1, p. 2).

The sum of the five scores is the CTP score." (Doc. 22-2, p. 10). The CTP score, therefore, is not identical to an individual's HAI grade and plaintiff's assertion that he has decompensated cirrhosis is not supported by the evidence.

Based on the foregoing, plaintiff has not established hepatitis C poses an imminent danger of serious physical injury. Although Mr. Melendez disagrees with the discontinuation of the Pegasys regimen and staff's failure to administer it as instructed, the fact a previous attempt at treatment failed–for whatever reason–does not necessarily establish that plaintiff is currently in imminent danger. *See Brown v. Johnson*, 387 F.3d 1344, 1349 (11th Cir. 2004) ("a prisoner must allege a present imminent danger, as opposed to a past danger, to proceed under section 1915(g)"). Both the hepatitis C and the condition of plaintiff's liver are being monitored according to the BOP's guidelines and additional treatment is not clinically indicated at this time. (Doc. 33-1, p. 8); *cf. Black v. Ala. Dep't of Corr.*, 578 F. App'x 794 (11th Cir. 2014) (no deliberate indifference when medical personnel monitored prisoner's hepatitis C and found the condition was stable and did not require admission to treatment program).

<u>Gastrointestinal Issues</u>

On May 30, 2012, Dr. Shah performed a colonoscopy which showed "proctitis and hemorrhoids," but was an "otherwise normal exam." (Doc. 14-2, p. 67). On August 29, 2014, plaintiff provided staff with three stool specimen cups which tested

positive for the presence of blood.  (Doc. 15-1, p. 8).  Nurse Nichols scheduled an appointment for plaintiff at Reception Medical Center ("RMC").  (*Id.*, p. 9).  The FDOC's records indicate plaintiff refused a transfer to RMC and declined to sign a "refusal form" on September 30, 2014.  (*Id.*, p. 9-10).

Plaintiff's description of September 30 differs considerably.  Plaintiff asserts Officer Jinx told him to pack his property at 6:55 a.m.  (Doc. 15-1, p. 14).  One or two minutes later, two officers approached plaintiff's cell as he was using the bathroom.  (*Id.*).  The officers became upset because plaintiff was not packed and they did not believe he was packing fast enough.  (*Id.*).  The officers threatened plaintiff and told him they would beat him off camera.  (*Id.*).  Plaintiff requested to see a lieutenant to report the threats; one of the transport officers left and returned with Nurse Donahoo.  (*Id.*).  After plaintiff informed Donahoo of the threats, she asked him if he refused the transfer.  (*Id.*, p. 14-15).  Plaintiff said "no, I'm packing but I still want to see the lieutenant."  (*Id.*, p. 15).  Donahoo and the officers left plaintiff's cell; plaintiff later learned that Donahoo and the officer signed a form indicating plaintiff refused the transfer.  (*Id.*).

The Chronological Record of Health Care indicates plaintiff returned three hemoccult[8] cards ("hemo cards") to SRCI medical staff on February 12, 2015, each

_____

[8] "A 'Hemoccult' test is a trade name for the guaiac test for occult (i.e. hidden) blood."  *Del Raine v. Jumao-as*, 76 F.3d 381, 1996 WL 47088, at *3 n.4 (7th Cir. 1996) (*citing* Dorland's Illustrated Medical Dictionary at 746-47).

of which tested negative for the presence of fecal blood.  (Doc. 14-2, p. 24).  Plaintiff, however, claims "either the hemo cards were not checked or the entry was fabricated because I bleed internally still[.]"  (Doc. 15-1, p. 15).  In September 2015, plaintiff again complained about blood in his stool.  (Doc. 15-1, p. 59).  At sick call on September 15, a nurse noted that Melendez "refused stool cards for specimen stating he only wants stool cups."  (Doc. 14-2, p. 10).  Plaintiff disputes that he was offered hemo cards, claiming Nurse Rosati did not "make any efforts to address" his complaints.[9]  (Doc. 15-1, p. 16, 74-75).

On  November  18,  2015,  Nurse  Nichols  prescribed  Proctozone-HC,  a hydrocortisone cream used to treat hemorrhoids.  (Doc. 15, p. 4).  Plaintiff asserts Proctozone "is not the appropriate medication for the internal bleeding" because "the instructions clearly indicate in bold lettering 'For External Use Only.'"  (Doc. 15, p. 4).  At sick call on November 25, 2015, plaintiff stated that after a bowel movement he can "fill up a specimen cup [with] green lid 'at least halfway [with] dark bright red blood[.]'"[10]  (Doc. 29-1, p. 20).  When Nurse Moore asked to see plaintiff's

_____

[9] Plaintiff did express a preference for stool cups in a Sick-Call Request dated August 24, 2014: "I will not accept anyone to submit me to accept that a physical examination by inserting a (finger) inside me be done.  I will only give a cup sample for lab testing as I've done before."  (Doc. 15-1, p. 56).

[10] Plaintiff claims the medical record indicates he "submitted a specimen cup with green lid at least halfway [with] dark bright red blood."  (Doc. 33, p. 4).  Based on this mischaracterization of the record, plaintiff claims the November 26, 2015 entry reflecting the hemo cards were negative is false.  (*Id.*, p. 3-4).

hemorrhoids, he stated "you can't see them, they are inside." (*Id.*). Moore noted no abnormality and no evidence of hemorrhoids but nevertheless gave plaintiff three hemo cards. (*Id.*, p. 19-20). Plaintiff returned the cards to Nurse Grice the next day. (Doc. 15-1, p. 43, 75). All three cards tested negative for the presence of blood. (Doc. 29-1, p. 19). Likewise, FDOC records indicate that on January 19, 2016, plaintiff returned a stool specimen cup that tested negative for blood. (*Id.*, p. 14).

Later in 2016, however, testing confirmed the presence of blood in plaintiff's stool. On April 9, 2016, plaintiff reported bloody stool and a hemo card returned a positive result. (Doc. 33-1, p. 10). Plaintiff was placed in the infirmary under 23-hour observation. (*Id.*). His medications included Prilosec and Zocor. (*Id.*, p. 12). On May 2 and 10, plaintiff returned hemo cards that tested positive for blood. (Doc. *Id.*, p. 6). The examining nurse referred plaintiff to a clinician for evaluation. (*Id.*).

Plaintiff commenced a hunger strike on May 11. (*Id.*, p. 4). On May 16, 2016, Dr. R. Calaycay examined plaintiff and advised him of the consequences of the hunger strike. (*Id.*). Medical personnel continued to encourage plaintiff to eat throughout May 16. (*Id.*, p. 3). On May 17, 2016, plaintiff reported experiencing bloody stool and abdominal pain. (*Id.*, p. 1, 3). At the time, plaintiff's medications included Lipitor, Protonix, and Anusol-HC cream, a medication used to treat hemorrhoids. (*Id.*, p. 1). Notes from May 18, indicate plaintiff continued to have rectal bleeding but it had not increased. (*Id.*, p. 2).

Although recent medical records document the presence of blood in plaintiff's stool, medical personnel have closely monitored plaintiff's condition and he has been examined by Dr. Calaycay.   In addition, plaintiff has been prescribed medication to treat hemorrhoids.   Based on the foregoing, plaintiff has not established the rectal bleeding places him in imminent danger of serious physical injury.

Blood Sugar & Cholesterol

An A1C level "shows what percentage of a person's hemoglobin is coated with sugar.  The higher the percentage, the poorer the blood sugar control and the higher the risk of developing diabetes.  Generally, an A1C level of 6.5 percent or higher on two separate tests indicates diabetes, while 5.7 to 6.4 percent is considered prediabetes, which indicates increased risk of developing diabetes."  (Doc. 16-1, p. 1).  In February 2015, plaintiff's A1C level was 5.6, which is normal.  (*Id.*; doc. 14-2, p. 77).

Melendez's July 12, 2015 labs showed his A1C level was 5.9.  (Doc. 14-2, p. 13, 73-74).  The July 12 tests also indicated Mr. Melendez's total cholesterol level was normal at 182 mg/dL.  (Doc. 14-2, p. 72; doc. 16-1, p. 1).  His non-HDL (143 mg/dL) and LDL cholesterol levels (128 mg/dL), however, were a "little high." (Doc. 14-2, p. 72; doc. 16-1, p. 1).

In late July, plaintiff visited the Chronic Illness Clinic; medical staff discussed exercise and healthy lifestyle changes.  (Doc. 14-2, p. 39; doc. 16-1, p. 1).  Dr. Maier indicates: "Educating a patient to try to improve his numbers for cholesterol and sugar levels through diet, exercise and other lifestyle changes is generally the standard of care before resorting to medication.  In [Melendez's] case, given that none of his labs showed any major cause for alarm, this was appropriate."  (Doc. 16-1, p. 1-2).   In response to these recommendations, plaintiff claims Dr. Shah previously issued a pass instructing him not to lift, push, or pull heavy objects because "the liver damage would surely cause my death as bad as it's already damaged."  (Doc. 15, p. 6).  Plaintiff also indicates that specialists at Reception Medical Center previously provided him with diet passes "which the ARNP ended and has refused to renew claiming [plaintiff] is not diabetic."[11]  (Doc. 15, p. 7). Plaintiff further asserts that he "has no control over D.O.C. food service."[12]  (Doc. 15, p. 7).

On August 26, 2015, a comprehensive metabolic panel revealed plaintiff's glucose level was 85 mg/dL, "well within the normal range of 70-100."  (Doc. 14-2,

---

[11] The evidence presented by plaintiff indicates he was provided with a 2800 calorie diet pass for part of 2012 and the majority of 2013.  (Doc. 15-1, p. 53-54).  He also had a low residue diet pass at the end of 2013 and the beginning of 2014.  (*Id.*, p. 52).

[12] Although plaintiff suggests he has no control over his diet, the inmate trust fund account statement plaintiff submitted with his motion to proceed *in forma pauperis* reflects a number of canteen sales.  (Doc. 2, p. 6).

p. 11, 71; doc. 16-1, p. 2).  On September 13, 2015, plaintiff filed an Inmate Sick-Call Request questioning, *inter alia*, why nothing was being done about his high cholesterol.  (Doc. 15-1, p. 59).  He was seen by Nurse Rosati on September 15.  (Doc. 14-2, p. 10-11).  Melendez acknowledged he was advised to make lifestyle changes but "would not say at th[e] time if he made the[] changes."  (*Id.*, p. 11).  Nurse Rosati reviewed plaintiff's lab results with him again and concluded no treatment was needed for the cholesterol levels.  (*Id.*, p. 10).  Melendez was instructed to return to medical as needed.  (*Id.*).  On November 18, two doctors recommended that plaintiff "be put on a statin for LDL of 128 in July."  (*Id.*, p. 9).  The doctors indicated they were "aware of his Hep C status and his cardiac risk of 6% for next 10yrs."  (*Id.*).  Nurse Nichols prescribed Lipitor and scheduled additional blood tests in six weeks.  (*Id.*, p. 47; doc. 15-1, p. 45).  On November 18, 2015, Nurse Grice delivered the medication to plaintiff but told him she did not know the medication's purpose.  (Doc. 15-1, p. 42-43).  Later, Grice informed plaintiff the new medication was for his stomach problems.  (*Id.*, p. 43).

At sick call on November 25, 2015, tests revealed Mr. Melendez's blood sugar level was 165.  (Doc. 15-1, p. 43, 75).  Nurse Moore told plaintiff the Lipitor was prescribed to treat high cholesterol, but plaintiff told Moore that "Dr. Shah had previously cancelled the order for cholesterol medication cause it damaged my liver worse than it was."  (*Id.*, p. 43-44).  Later that day, Moore approached plaintiff's cell

and presented him with a medication refusal form. (*Id.*, p. 44). He refused to sign the form. (*Id.*). Plaintiff took seven Lipitor pills between November 18 and November 25. (*Id.*, p. 45).

Testing performed on November 30, 2015, revealed plaintiff's A1C level was 5.8, suggesting he was at an increased risk of diabetes. (Doc. 29-1, p. 30). The most recent lab results from May 23, 2016, however, showed plaintiff's glucose level at 94 mg/dL, which is within normal limits. (Doc. 33-1, p. 13).

Plaintiff's allegations concerning his cholesterol and blood sugar levels are insufficient to meet the imminent danger exception to § 1915(g). Although plaintiff's blood sugar tests have yielded elevated results, he has not been diagnosed as diabetic. In addition, plaintiff's most recent lab results show his blood sugar level is within normal limits. Likewise, plaintiff's elevated cholesterol levels have not been shown to pose an imminent danger of serious physical injury. *See Richardson v. Hite*, 53 F. App'x 291, 292 (4th Cir. 2002) ("Reviewing Richardson's complaint, only his allegation that prison officials denied him medication for his elevated cholesterol levels could possibly satisfy the imminent danger exception to § 1915(g). Although § 1915(g) should not be read to interfere with inmates' ability to complain about unsafe, life-threatening conditions in their prison without waiting for something to happen to them, Richardson failed to demonstrate his elevated cholesterol levels were necessarily dangerous or that medication was a medical

necessity.") (internal quotations and citations omitted).  Furthermore, records from April 27, 2016, reflect that plaintiff is taking Zocor, a medication used to treat high cholesterol and triglyceride levels.[13]  (Doc. 33-1, p. 7).

Deliberate Indifference

Importantly, based on the complaint and medical record, plaintiff could not establish that the FDOC's medical personnel have exhibited deliberate indifference to his various conditions.  *See Goodman v. Kimbrough*, 718 F.3d 1325, 1331-32 (11th Cir. 2013) (To show a defendant was deliberately indifferent, a plaintiff must prove: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than gross negligence.") (*quoting Townsend v. Jefferson Cty.*, 601 F.3d 1152, 1158 (11th Cir. 2010)); s*ee also Brown*, 387 F.3d at 1351 ("The determination that Brown alleged imminent danger of serious physical injury does not end our inquiry.  We may affirm the district court on any ground that finds support in the record.  If Brown's amended complaint fails to state a claim for deliberate indifference, then the dismissal of the amended complaint must be affirmed.") (internal citation omitted).  Staff have monitored plaintiff's conditions

---

[13] Plaintiff's most recent medical records also indicate he suffers from bilateral leg swelling that makes it difficult for him to walk and causes him to fall.  (Doc. 33-1, p. 20).  Upon examination, however, the nurse noted only "barely detectable impression when finger is pressed into skin." (*Id.*, p. 21).  Furthermore, plaintiff has been issued a walker with wheels to assist with movement. (Doc. 33-1, p. 6).  Plaintiff has not shown the leg swelling poses an imminent danger of serious physical injury.

and concluded that either conservative treatment or no treatment is necessary. Although Melendez disagrees with this assessment, a disagreement between staff and an inmate concerning the latter's course of treatment is not an appropriate basis for finding an Eighth Amendment violation. *See Adams v. Poag*, 61 F.3d 1537, 1545 (11th Cir. 1995) ("[W]hether governmental actors should have employed additional diagnostic techniques or forms of treatment is a classic example of a matter for medical judgment and therefore not an appropriate basis for grounding liability under the Eighth Amendment.") (quotation marks omitted); *see also Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000) (To establish deliberate indifference, the defendant's response to the medical need must be more than "merely accidental inadequacy, negligence in diagnosis or treatment, or even medical malpractice actionable under state law.") (citation and quotations omitted).   The Eighth Amendment is not a vehicle for prisoners seeking to dictate the minute details of medical care absent a showing of deliberate indifference.

## CONCLUSION

Plaintiff is a 57-year old man who suffers from several chronic medical conditions.  He, however, is receiving treatment and his various conditions are being monitored.  Plaintiff does not satisfy the imminent danger exception of 28 U.S.C. § 1915.  Based on the medical records, the severity of Melendez's conditions, singly or in combination, do not establish that he is in imminent danger of serious physical

injury such as could be redressed in a civil rights suits.  Because plaintiff did not pay the $400.00 filing fee at the time he initiated this action, and because it plainly appears plaintiff is not entitled to proceed *in forma pauperis*, this case should be dismissed without prejudice under § 1915(g).  *See Dupree v. Palmer*, 284 F.3d 1234, 1236 (11th Cir. 2002)  (holding that "the proper procedure is for the district court to dismiss the complaint without prejudice when it denies the prisoner leave to proceed *in forma pauperis* pursuant to the provisions of § 1915(g)" because the prisoner "must pay the filing fee at the time he initiates the suit."); *Vanderberg v. Donaldson*, 259 F.3d 1321, 1324 (11th Cir. 2001) (stating that after three meritless suits, a prisoner must pay the full filing fee at the time he initiates suit).

Accordingly, it is ORDERED:

1.     The clerk shall update the docket to reflect that plaintiff's current address is: Santa Rosa Correctional Institution Annex, 5850 East Milton Road, Milton, Florida 32583-7914.

2.     Plaintiff's motion for leave to file a reply (doc. 24) is GRANTED.

3.     The clerk shall strike plaintiff's "Supplemental Civil Rights Complaint" (doc. 35) from the record.[14]

---

[14] Plaintiff filed a "Supplemental Civil Rights Complaint" raising additional, and somewhat unrelated, claims concerning his healthcare and treatment by guards at Blackwater River Correctional Facility.  (Doc. 35).  Because the supplemental complaint is in essence an amended complaint and plaintiff did not seek permission from the court to file an amended complaint, the Supplemental Civil Rights Complaint will be struck from the record.

And it is respectfully RECOMMENDED:

1.     That plaintiff's motion to proceed *in forma pauperis* (doc. 2) be DENIED.

2.     That plaintiff's Motion Seeking Temporary Injunction (doc. 17) be DENIED AS MOOT.

3.     That this action be DISMISSED WITHOUT PREJUDICE under 28 U.S.C. § 1915(g).

4.     That the clerk be directed to close the file.

At Pensacola, Florida, this 30th day of August, 2016.

*s/Charles J. Kahn, Jr.*
**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**

NOTICE TO THE PARTIES

Objections to these proposed findings and recommendations may be filed within fourteen (14) days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of objections shall be served upon the Magistrate Judge and all other parties.   A party failing to object to a Magistrate Judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions.  *See* U.S. Ct. of App. 11th Cir. Rule 3-1; 28 U.S.C. § 636.